COLÓN ET AL., APPELLANTS, *v.* THE REGISTRAR OF AGUADILLA, RESPONDENT.

APPEAL from a Decision of the Registrar of Property Denying Admission to Record of a Deed of Cancellation of Mortgage.

No. 214.—Decided April 21, 1915.

CONFLICT OF LAWS—RULES OF DECISION.—Insular courts, in so far as they are at liberty to choose between rules for the prevention of a conflict of laws, should consider the substantial rights, interests, and convenience of the people in the light of the political status and future commercial relations of the Island, rather than the relative merits of conflicting theories; and, in so far as consistent with our special system of local laws, should seek to align their rules of decision with those of the American courts, State and Federal.

LEX REI SITÆ—CAPACITY OF PARTIES—CIVIL CODE—REAL AND PERSONAL STATUTES—EFFECT OF FOREIGN LAWS.—The adoption and application of the rule of *lex rei sitæ*, as extended by the American courts to include and govern the capacity of the parties, does no violence either to the letter or to the spirit of our Civil Code or to any fundamental principle underlying the same, and establishes once for all a single, fixed, comprehensive and rational rule conducive to the avoidance of inconsistencies and confusion in our decisions as to real and personal statutes and the effect of foreign laws.

ID.—CANCELLATION OF MORTGAGE—TUTOR—AUTHORIZATION OF COURT—CONSTRUCTION OF LAW.—Construing sections 9, 10, 11, 282 and 284 of the Revised Civil Code, each in relation to the other and all in the light of the changes and amendments made by the Legislature in 1902 and thereafter, as well as the clear intention and purpose thereof, a Spanish tutor of Spanish minors, all residing in Spain, the tutor having been appointed by the family council pursuant to the Spanish Civil Code, or the agent or attorney in fact named for the purpose by the said tutor, must obtain previously the authorization of the insular district court of the district where the property is situated in order to execute a cancellation of a mortgage on real property situated in Porto Rico.

The facts are stated in the opinion.

*Messrs. Reichard & Reichard* for the appellants.

Mr. Rafael Tirado Verrier, the respondent registrar, appeared *pro se*.

MR. JUSTICE HUTCHISON delivered the opinion of the court.

A single question is presented for decision by this case as made. It is whether or not the Spanish tutor of Spanish minors, both tutor and pupils residing in Spain, duly authorized by the family council, as required by the Spanish Code, to execute a cancellation of mortgage upon real estate in Porto Rico, or the regularly constituted attorney in fact of such tutor, must, before he can execute such instrument of cancellation in this Island, obtain from an insular district court an order authorizing such action in accordance with the provisions of the local law.

The Registrar of Property of Aguadilla refused to record a cancellation of mortgage executed at Aguadilla by the agent and attorney in fact of a Spanish tutor under the circumstances just outlined, upon the sole ground that judicial authorization therefor had not been first obtained as required by subdivision 5 of section 282 of our Revised Civil Code, referred to in the endorsement as "the only law applicable to the case, the situs of the right sought to be canceled, an immovable under the law, being in Porto Rico."

Sections 9, 10 and 11 of the Civil Code and section 282 thereof, in so far as pertinent to the question at issue, read as follows:

"Section 9.—The laws relating to family rights and obligations, or to the status, condition and legal capacity of persons, shall be binding upon the ciitzens of Porto Rico, although they reside in a foreign country.

"Section 10.—Personal property is subject to the laws of the nation of the owner thereof; real property to the laws of the country in which it is situated.

"Section 11.—The forms and solemnities of contracts, wills and other public instruments are governed by the laws of the country in which they are executed.

"When such acts are authorized by diplomatic or consular offi-

cials of the United States abroad, the formalities established for their execution by the laws of the United States shall be observed.

"Notwithstanding the provisions of this and the preceding section, prohibitory laws relating to persons, their acts or property, and those which relate to public order and to good morals shall not be held invalid by reason of laws, decisions, regulations or agreements in force in any foreign country.

*          *          *          *          *          *          *

"Section 282.—The tutor shall require the authorization of the proper district court:

*          *          *          *          *          *          *

"5. To alienate or encumber the real property which constitutes the capital of the minor or incapacitated person or to make contracts or execute acts requiring recording; also to alienate personal property, the value of which exceeds two hundred dollars and to execute lease contracts for a longer period than six years; but in no case shall the contract be entered into nor the authorization granted for a period of time in excess to that required by the minor to become of age.

"The limitations contained in the preceding paragraph relative to the execution of contracts for the lease of real property, shall apply to the contracts for advances for agricultural purposes and grinding of cane, authorized by the Act of March 10, 1910.

"The prohibition to alienate personal property the value of which exceeds two hundred dollars, without judicial authorization therefor, does not cover the alienation of the fruits yielded by a landed or agricultural property, at its last crop."

*          *          *          *          *          *          *

Sections 9 and 11, *supra,* are substantially identical with the corresponding articles of the Spanish Code. Articles 10 and 269 of the latter, corresponding to sections 10 and 282, *supra,* are as follows:

"Article 10.—Personal property is subject to the laws of the nation of the owner thereof; real property to the laws of the country in which it is situated.

"However, legal and testamentary successions, with regard to the order of succession, as well as to the amount of the successional rights and to the intrinsic validity of their provisions, shall be regulated by the laws of the nation of the person whose succession is in

question, whatever may be the nature of the property and the country where it may be situate.

\*     \*     \*     \*     \*     \*     \*

"Article 269.—The guardian requires the authority of the family council—

\*     \*     \*     \*     \*     \*     \*

"5. To alienate or encumber the property constituting the capital of minors or incapacitated persons, or to make contracts or execute instruments subject to record."

\*     \*     \*     \*     \*     \*     \*

In the Report of the Insular Code Commission of 1902, we find the following significant and luminous explanation of the innovations introduced in the Preliminary Title, including the omission of the latter portion of the Spanish article 10:

"The most important reform made in the Preliminary Title of the Code is that respecting the restriction of the doctrine of real and personal situs, taking into account and applying the general principle of American law, that all rights respecting real property must be regulated, both as regards contracts and agreements made with respect thereto and the rights of inheritance, by the law of the country in which they are situated."

We need not discuss or even state the familiar rules of *lex loci celebrationis* and *lex rei sitæ* as understood and applied by the American courts to govern the capacity of the contracting parties. See 5 R. C. L., 925, 949, 952, and 32 Cyc., 674.

With characteristic brevity and insight, Professor Raleigh C. Minor, at page 28 of his excellent and incisive treatise on Conflict of Laws, aptly states the true reason for the rule last mentioned as applied throughout the United States:

"Although this principle is generally recognized, the reason for the doctrine has not always been kept clearly in view. In truth, it simply constitutes one branch of the first exception, already discussed, and what is known as the *lex situs* is, in the last analysis, nothing more than the *lex fori*. Since immovable property is fixed forever in the State where it lies, and since no other State can have

any jurisdiction over it, it follows necessarily that no right, title, or interest can be finally acquired therein, unless assented to by the courts of that State, in accordance with its laws. The courts of no other State can finally pass upon such questions, so as to give or take away from any litigant a claim to the property. On the other hand, the courts of the situs of the land will be peculiarly rigid in their requirement that the law of the situs be complied with in regard to the transfer of the title to that class of property. The policies of each State in connection with the transfer of land within its limits are justly ranked amongst the most important of all its policies, no outside·interference with which will be tolerated. Every effort is made by each State to have its laws touching the devolution, transfer, and charge of lands within its borders as definite and certain as possible. Particular formalities are required which are not required in other matters. And it is of the utmost importance that the legal records of such transactions, constituting chains of title to land, should be kept free from blemish, irregularity, or confusion with the requirements of other States.

"Hence it becomes peculiarly a part of the policy of every State that no transactions relating to the transfer of any interest in or title to immovable property situated there shall be upheld, if violative of its own law, whether valid by the laws of foreign States or not. These considerations are amply sufficient to induce the courts of the situs of land (when the situs is the forum) to prefer their own laws upon this subject to those of any other State.

"Nor will the courts of other States attempt to enforce their own laws with respect to land situated elsewhere, not only because of the spirit of comity and their unwillingness to engage in conduct towards other States, which they would not tolerate in other States towards themselves, but also, and perhaps chiefly, because of their utter inability to render any judgment or decree that would be final and effectual to transfer any interest in the land. Instead, therefore, of rendering idle judgments in accordance with their own law, the courts, in dealing with the title to foreign real estate, will seek to determine the rules laid down by the *lex situs* of the land, and will decide in accordance with that law, for to it the parties must finally appeal in any event.

"Thus it comes to be a well settled principle of private international law, fortified by a great mass of authority, that all questions relating to the transfer of title to immovable property, wherever arising, will be governed by the *lex situs,* the law of the ultimate forum in which all such questions must finally be decided."

The decision of this case does not necessarily require us either to challenge the wisdom of Story and Wharton or to combat the seductive logic of Fiore and the modern trend of European thought. In so far as we are at liberty to choose the rule by which we shall determine whether a given case falls within the personal or within the real statute, we should consider the substantial rights, interests and convenience of our own citizens in the light of our present political status and future commercial relations under new conditions brought about by the recent change of sovereignty, rather than the intrinsic merits of this or that theory viewed in the abstract.

We may do well to differentiate between questions arising directly from an actual conflict of laws and those growing out of conflicting rules of decision in this regard, or, more accurately perhaps, out of conflicting opinions as to whether or not, or as to how and to what extent, a rule universally recognized should be applied to govern a particular case.

"The laws of the state actually enforced within the territory of another are national laws; the rules by virtue of which they are enforced are international rules. In describing such rules, Sir Henry Maine has referred to them as 'prescribing the conditions on which one community will recognize and apply a portion of the jurisdiction of another.' If we add the manifest purpose for which such rules were made, the phrase completes itself,—'International Rules for Prevention of a Conflict of Laws.' When the shorter phrase, 'Conflict of Laws,' is used simply as an abbreviation, it is unobjectionable." Taylor, Science of Jurisprudence, 627.

More than half a century ago a clear-visioned Louisiana lawyer pointed out this distinction:

"It may not be improper here to observe, that the principles, on which questions arising out of the conflict of laws have been determined in the courts acting under the civil or the common law, appear to be wholly independent of either, as a system. It is true, that the conflict may arise out of the difference between the principles of the common and the civil law; as has happened repeatedly in this State, in questions of sale. 4 Mart. 20. 5 Mart. 23. 7 Mart. 24.

2 Mart. N. S. 93. But it is clear that, the principles by which this conflict is to be determined, are quite distinct from the principles which create the conflicting rights themselves. Frequent allusion to the diversity of laws between different States, is, it is true, to be found in the Pandects, and the Roman lawyers 'have established principles which have served as landmarks to direct the operations of their successors.' Livermore's Dissertation, § 2, 8. But they have decided but few cases, and there is nothing, either in the subject itself or in the foreign authorities who have treated of it, that is more suited to the genius of the civil than the common law. And, therefore, though the former be the basis of our own jurisprudence, still, on this subject, we see no reason why the court should look less favorably upon the rule established by the English and American courts, simple and consistent as it is, than upon the speculations and theories of writers, who have established systems always at war with each other, and not unfrequently with themselves." 3 La. Ann., 420.

As illustrative of the well-recognized and commendable tendency of the Louisiana Supreme Court to conform to common law standards and to align its rules of decision with those of the other States and of the Supreme Court of the United States in so far as consistent with the fundamental principles of the special and exceptional system of local laws there in force, in many respects substantially identical with our own, we may, without quotation or comment, invite attention to the preface to Saunder's Revised Civil Code of Louisiana, 1909, and to the Centenary Celebration proceedings published in 133 Louisiana Reports, with special reference to the able discussion of Louisiana Jurisprudence by Charles Payne Fenner, Professor of Civil Law, Tulane University Law School, and to the eloquent tribute by Judge T. C. W. Ellis to "The Louisiana Bar, 1813-1913." See also Law: Its Origin, Growth and Function, Carter, p. 304, and The Science of Jurisprudence, Taylor, preface, and chapter on Roman and English Law Combined, pp. 465-497.

There is no middle ground. We must either, frankly and without mental reservation, accept or else flatly refuse to apply the American rule of *lex rei sitæ* as the proper test

in determining the legal capacity of parties to real estate transactions. We may therefore profit by the experience of the Supreme Court of Louisiana and, by the adoption now, once for all, of a single, fixed, comprehensive and rational rule, avoid in our own decisions as to real and personal statutes and the effect of foreign laws the inconsistencies and confusion of the Louisiana law in this regard in the earlier stages of its arduous and painfully fluctuant development.

It is also proper, in establishing a precedent of this kind, that we should bear in mind the point of view from which such questions might be considered on appeal from a decision of this court, and, making due allowance for possible distinctions to be drawn in cases originating in other than Federal courts, reference may be had to the excellent and extensive Note to *Snare & Triest Co.* v. *Friedman,* 40 L. R. A., New Series, 380, dealing with *Questions of state law as to which of the decisions of the highest state court must be followed in actions originating in, or removed to, the Fedtral courts,* and especially subdivision IV *h, Conflict of laws,* p. 426, and *III, Constitutional and statutory questions, e, Effect as distinguished from construction; decisions resting on general reasoning; scope of decision,* p. 399.

This court has already said in *Cruz* v. *Domínguez,* 8 P. R. R., 551, and with express reference to the political status of the Island, that ''The principle of private international law which its tribunals should follow, at least in divorce matters, is naturally that which has been developed in the United States''; and an interpretation of the universal rule of *lex rei sitæ,* as including and governing the capacity of parties dealing directly with land in Porto Rico, does no violence either to the letter or to the spirit of our Civil Code or to any fundamental principle underlying the same.

Moreover, such application of the rule in question has actually been made by this court in at least one instance. In the case of *Amadeo* v. *The Registrar of Property,* 3 P. R. R., 263, a French citizen transferred certain real estate

under a deed of conveyance in which it was shown, in view
of section 159 of the Civil Code referring to the alienation
of real property belonging to the conjugal community, that
according to the provisions of the French Civil Code, set up by
the vendor as governing the transaction, the latter had charge
of the administration of all property belonging to the con-
jugal partnership, without any restriction whatever.   The
Registrar of Property of Ponce refused to record the deed,
"because, it appearing therefrom that Felipe Pietri y Moretti
is married, the sale has been made without the consent of his
wife, as provided by section 1308 of the Civil Code."

This court, speaking through Mr. Chief Justice Quiñones,
said:

"According to the section of the new Civil Code cited by the
registrar in his memorandum, and which corresponds to section 1328
of the official edition thereof, notwithstanding the powers which the
husband has as administrator of the conjugal partnership, he shall
not have the power to give, to alienate or to bind for a consideration
the real property of the conjugal partnership without the express
consent of the wife; and every alienation or agreement which the
husband may make in respect to such property in violation of said
section shall be null and shall not prejudice her interests nor those
of her heirs; a provision which is applicable to the deed of sale of
real property referred to in the appeal under consideration, said debt
having been executed by Felipe Pietri y Moretti on December 22, 1902,
or a long time after the date upon which the aforesaid Civil Code took
effect in this Island.   The application of the above provision in the
present case is not affected by the statement made in clause four of
the aforesaid deed, with reference to the qualification of the vendor,
Felipe Pietri, to execute said deed under the laws of his country,
as a French citizen, inasmuch as, according to the principles of pri-
vate international law, universally recognized in the determination
of disputes of this nature, questions relating to the efficacy or
nullity of acts and contracts directly affecting real property are
regulated by the laws of the Estatuto real, or the laws of the coun-
try where such real property is situated, a principle recognized and
sanctioned by the new Civil Code in sections 10 and 1292 thereof,
the former prescribing that real property is subject to the laws of
the country where it is situated, and the latter, that should the mar-

riage be contracted in a foreign country, between à Porto Rican and a foreign woman, or between a foreigner and a Porto Rican woman, and the contracting parties should not state or stipulate anything with regard to their property, it shall be understood, when the husband is a Porto Rican that he marries under the system of the legal conjugal partnership, and when the wife is à Porto Rican that she marries under the system of laws in force in the husband's country, 'all without prejudice to what is established in said code with regard to real property.' "

It is true that the *Dirección General de los Registros de España,* in 1894 and in à case somewhat similar to the one now before us, held, upon the theory of an implied reciprocity in the provisions of article 9 of the Spanish Code and upon general principles of private international law, that "The institution of tutorship is governed by the national law of the minor although his property be in à foreign country, the reason being that the protection of citizens having been confided to the national law, it would not be just to deprive the latter of one of its highest and most delicate ends, that which presides over the organization of the tutorship; that the laws relating to the legal capacity of persons, and, therefore, to the manner of completing the same when deficient, are binding upon Spaniards although residing abroad, a juridical criterion logically applicable when the capacity of a foreigner in Spain is to be passed upon, inasmuch as the extra-territorial force of all laws demands, upon principles of reciprocity, that like effect be given to the laws of other countries"; and, therefore, that an attorney in fact of the British guardian of a British ward, the two last mentioned residing in London, was not required to obtain the authorization of a family council in Spain in order to accept the transfer of a mortgage credit made in a notarial instrument executed in favor of such ward.

Had our Legislature in 1902 merely re-enacted the Spanish Code in its entirety, without change or modification of the sections construed by the *Dirección General* or of other

correlated sections, and had there been no subsequent amendments, then we might perhaps find no inconvenience in accepting, together with the code, the interpretation so placed upon it. That, however, is not the case.

In full harmony with the spirit of the revision recommended by the Code Commission with the avowed intention of "applying the general principle of American law that all rights respecting real property must be regulated, both as regards contracts and agreements made with respect thereto and the rights of inheritance, by the law of the country in which they are situated," our Legislature has not only eliminated from article 10 of the Spanish Code the provision that "legal and testamentary successions, with regard to the order of succession, as well as to the amount of the successional rights and to the intrinsic validity of their provisions, shall be regulated by the laws of the nation of the person whose succession is in question, whatever may be the nature of the property and the country where it may be situate," and the whole of Title I, Book First, of the said code, including article 27 thereof, providing that "foreigners enjoy in Spain the rights which the civil laws grant to Spaniards," etc.,—but, in the re-enactment of article 269 as section 282 of our code, clearly distinguishes between real and personal property; and, as if to remove all possibility of doubt as to the intention of substituting the *léx rei sitæ* and *lex fori* for the law of the personal situs in such matters, has further expressly provided in section 284 that—

"The judicial authorization to alienate, encumber or lease the property of the minor or incapacitated person or to settle or compromise by arbitration private or judicial matters affecting the rights of the minor or incapacitated persons, shall be decided by the district court of the district wherein the property is situate, or by the court where the litigious question has been or should be raised, after demonstrating the necessity and utility involved in the case, in conformity with the provisions of this act and those of an act relative to special legal proceedings."

We need not set forth at length the details of the law governing the special proceedings in question. It may be conceded that in practice a number of the requirements of sections 80 and 81 of the law might properly be held not to apply in the case of a foreign tutor. Even as to real estate certain of the details looking principally to the protection of the minors and of their interests might perhaps be regarded as inapplicable to a foreign guardian, or, at least, the rule might be much relaxed as to the showing required to be made; but it will not do to say that the Legislature has done no more than to substitute the authorization of the district court for the authorization of the family council, if such a proposition is intended to establish as a corollary thereto the further conclusion that the district court merely stands in the shoes of the family council and that such substitution produces no legal effect or change in the scope, character, status, powers, point of view and purpose of the supervisory agency.

If the District Court of San Juan cannot, in the exercise of its supervision of a tutorship otherwise wholly under its control, authorize the alienation of property in Ponce, and if the San Juan tutor, notwithstanding such authorization, if attempted, must apply to the district judge of Ponce, how can the Spanish family council, residing in Spain, consistently be held to have such power of authorization, and upon what sound theory can the Spanish tutor be regarded as above the law that binds the San Juan tutor? If the law now in force in Porto Rico, like the Spanish Code, had primarily in view the protection of the minors and of their interests rather than that of other persons interested in the real estate, and in matters of record in the registry of property or pending in the district court of the situs and relating to or involving such real estate, then most assuredly the court exercising control over the tutorship would never have been arbitrarily deprived of so much of its jurisdic-

tion naturally flowing from its subrogation to the rights, powers and duties of the extinct family council. The only possible reason, justification or excuse for the distinction established in subdivision 5 of section 282, and for the specific mandate of section 284, would seem to be the same that underlies the application made by the American courts of the *lex rei sitæ* in such matters. The law draws no distinction between domestic and foreign tutors and creates no exemption in favor of the latter; and, construing section 9 of the code in connection with the other provisions of law above quoted and in the light of the changes and amendments indicated, and of the evident intention and purpose thereof, we are constrained to hold that, in dealing with real estate in Porto Rico, a foreign tutor, under the circumstances first above outlined, must obtain the previous authorization of the insular district court of the district where the land is situate, as provided by sections 282 and 284 of our Civil Code.

The ruling of the registrar should be

*Affirmed.*

Chief Justice Hernández and Justices Wolf, del Toro and Aldrey concurred.